UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA

SEAN ALTMAN and CHRISTIAN RODRIGUEZ, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

SIG SAUER, INC., a Delaware corporation,

Defendant.

CASE NO.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

This case concerns a defectively designed pistol, the Sig Sauer P320. Sig Sauer designed the P320 without any external (*i.e.*, manually operated) safety features, even though the pistol is effectively cocked (i.e., ready to fire) the moment a round is chambered. This is particularly galling because the P320 also has among the lightest and shortest trigger pulls of any comparable pistol on the market. The practical effect is that when consumers carry a loaded P320, it is akin to the consumer taking a loaded revolver, pulling the hammer back, and then walking around with that cocked pistol in the holster—all without any external safety features. As set forth herein, the combination of these features constitutes the Defect (as defined in paragraphs 31–41, *infra*) that uniformly exists in every P320.

But Sig Sauer does not tell consumers about the P320's Defect. Nor does Sig Sauer warn consumers that the P320 is extraordinarily dangerous compared to similar pistols. And what was the result? P320 users have experienced a slew of unintended discharges across the country. This has resulted in law enforcement agencies that purchased the pistols as duty weapons having to replace their entire inventory, and scores of victims filing personal injury lawsuits against Sig Sauer due to the serious injuries caused by the P320's Defect—a Defect that is uniform among every P320 sold in Florida.

This case seeks to hold Sig Sauer responsible for selling a needlessly dangerous product to consumers through unfair and deceptive practices in violation of Florida law. Sig Sauer has known about the P320's Defect for years but has done nothing to remedy the issue. Rather, it has actively concealed the Defect from its customers and the public. As a result, all Florida consumers who purchased the P320 have received a product that has the same Defect and was sold using the same unfair and deceptive practices.

## I. PARTIES

*Sean Altman*

1. Plaintiff Sean Altman is a citizen and resident of Florida, residing in the Northern District of Florida.

2. Plaintiff Sean Altman purchased a P320 in 2023, in the Pensacola, Florida area, without an external safety. He paid approximately $1,000 for his P320 and has spent nearly an additional $1,000 for accessories for that pistol.

3. Prior to the purchase of his P320 in 2023, Plaintiff Sean Altman saw a number of advertisements and influencer comments about the P320 online and in firearms-related publications promoting the P320 and in particular promoting the adoption of the P320 by the United States military.

4. Plaintiff Sean Altman recalls seeing statements in those materials that explicitly stated, or strongly implied, that the Sig Sauer P320 was a safe handgun and that it had been adopted by the United States military.

5. Nowhere in the materials Sean Altman saw before he purchased his P320 in 2023 did Plaintiff Sean Altman see anything about:

- The dangers associated with the Defect as described herein,
- That the P320 was energized anytime a round is chambered,
- That the P320 is unique among handguns omitting an external (i.e., manually operated) safety in that it has a short, light trigger pull and is fully energized anytime a round is chambered,
- That the P320 is more susceptible to inadvertently discharging that other comparable pistols, or
- That the military versions of the P320 are equipped with external safeties.

6. Plaintiff Sean Altman expected that any consumer firearm he purchased would not discharge absent a deliberate trigger pull and that its mechanisms would be consistent with industry safety standards.

7. Plaintiff Sean Altman was unaware of the Defect and the dangers associated with the Defect as described below until mid-2025 when seeing continuing reports of unintended discharge problems with the P320. At that point, Plaintiff performed extensive online research into the P320 and its dangers. Plaintiff now feels he cannot in good conscience use or sell his P320 because of its dangerous nature. Plaintiff has had to rely on other firearms he owned at the time he purchased his P320 as he cannot justify the expense of a replacement pistol given the amount Plaintiff has already spent on the P320 and its accessories.

8. Had Plaintiff Sean Altman known of the defective nature of the P320, he would have paid substantially less for the P320 he purchased or he would have purchased another handgun instead of the P320 he purchased in 2023.

*Christian Rodriguez*

9. Plaintiff Christian Rodriguez is a citizen and resident of Florida, residing in the Middle District of Florida.

10. Plaintiff Christian Rodriguez purchased three P320 pistols, each without an external safety.

11. Plaintiff Christian Rodriguez purchased a P320 pistol new in Florida in August 2024. He paid approximately $1,050 for this pistol.

12. In January, 2025, Plaintiff Christian Rodriguez paid approximately $400 each for two additional P320s that were law enforcement trade-ins.

13. Prior to the purchase of his P320s in 2024, Plaintiff Christian Rodriguez saw a number of advertisements and influencer comments about the P320 online and in firearms-related publications promoting the P320 and in particular promoting the adoption of the P320 by the United States military.

14. Plaintiff Christian Rodriguez recalls seeing statements in those materials that explicitly stated, or strongly implied, that the Sig Sauer P320 was a safe handgun and that it had been adopted by the United States military.

15. In addition to Sig Sauer's website, Plaintiff Christian Rodriguez reviewed videos on YouTube and Facebook regarding the P320, including one by Spartan Defense Armory that specifically referred to the P320 as a very safe gun.

16. Nowhere in the materials Plaintiff Christian Rodriguez saw before he purchased his P320s in 2024 and 2025 did Plaintiff see anything about:

- The dangers associated with the Defect as described herein,

- That the P320 was energized anytime a round is chambered,
- That the P320 is unique among handguns omitting an external (i.e., manually operated) safety in that it has a short, light trigger pull and is fully energized anytime a round is chambered,
- That the P320 is more susceptible to inadvertently discharging that other comparable pistols, or
- That the military versions of the P320 are equipped with external safeties.

17. Plaintiff Christian Rodriguez expected that any consumer firearm he purchased would not discharge absent a deliberate trigger pull and that its mechanisms would be consistent with industry safety standards.

18. Plaintiff Christian Rodriguez was unaware of the Defect and the dangers associated with the Defect as described below until it was widely reported that a United States Air Force airman had died following an unintended discharge of the P320 in mid-2025. Plaintiff then performed extensive online research into the P320 and its dangers. At this point, Plaintiff feels he cannot in good conscience use or sell his P320s because of their dangerous nature. He has had to spend additional money to purchase replacement handguns.

19. Specifically, since learning of the dangers associated with the P320, Plaintiff Christian Rodriguez has purchased a number of Glock-brand handguns, each costing hundreds of dollars. Had Plaintiff known of the

defective nature of the P320, he would have paid substantially less for the P320s he purchased or he would have purchased these Glock handguns instead of the P320s he purchased in 2024 and 2025.

*Sig Sauer, Inc.*

20. Sig Sauer, Inc. is a Delaware corporation with a principal place of business at 72 Pease Boulevard; Newington, New Hampshire 03801. As such, Sig Sauer, Inc. is a citizen of Delaware and New Hampshire.

21. Sig Sauer designs, manufactures, and markets firearms, including the P320.

## II. JURISDICTION AND VENUE

22. This Court has jurisdiction over this action under 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, and at least one member of the proposed class is a citizen of a state different from Defendant.

23. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) as a substantial part of the events giving rise the claim asserted herein occurred within the Northern District of Florida. Alternatively, venue is proper in this District under 28 U.S.C. § 1391(b)(3) as Sig Sauer is subject to personal jurisdiction with respect to this action in the Northern District of Florida.

## III. FACTUAL ALLEGATIONS

### A. Overview

24. Sig Sauer is a firearms manufacturer that designs, manufactures, and markets a pistol known as the P320. See P320 Pistols, Sig Sauer (accessed May 19, 2026), available at https://www.sigsauer.com/firearms/pistols/p320.html.

25. The P320 comes in various models (i.e., sizes, colors, etc.), but with respect to the pistol's internal mechanisms, all P320s are designed and work the same with the same safety characteristics.

26. The P320 has a unique design in the United States pistol market, combining a very light, short trigger pull with a design that cocks and 97% energizes the weapon anytime it is loaded.

27. When a single action pistol is "cocked" (either by manually thumbing the hammer or by operation of the slide) three things occur. First, the pistol is energized so that it has sufficient stored mechanical energy to discharge the primer of a loaded cartridge of ammunition. Second, the trigger pull distance of the pistol is almost always shortened. And third, the trigger pull weight of the pistol is almost always lessened.

28. The term "energize" describes the act of charging a pistol with mechanical energy that can be released to discharge the firearm.

29. The P320 combines these features making the pistol easier to discharge, while omitting any means of de-energizing the weapon when a round is chambered and omitting any external safety device to prevent the trigger from moving.

30. All of the P320s at issue contain the same Defect (as defined in paragraphs 31-41, *infra*).

**B. The Defect**

31. The Sig Sauer P320 is defective. The Defect has three components that, when combined, create an unreasonably dangerous product for its reasonably anticipated use.

32. Those components are: (1) the P320 is effectively fully energized and ready to fire the instant that a round is chambered; (2) the P320 has a minimal trigger pull because it is short and lightweight; and (3) the P320 lacks any external (i.e., manually operated) safety features. These characteristics, when combined, constitute "the Defect."

33. Because of the Defect, the Sig Sauer P320 when chambered is functionally equivalent to a cocked gun with no external safety features.

34. Sig Sauer does not inform customers that the P320 has sufficient energy to discharge a bullet any time a round is chambered.

35. All P320s have a very short, light trigger pull. That means the P320's trigger requires less work to fire the pistol than the trigger on pistols made by other manufacturers.

36. Despite being fully energized with a short, light trigger pull, Sig Sauer did not design the P320 to include any of the available external safety features routinely used on other pistols.

37. Sig Sauer knows that an external safety would make the P320 safer.

38. Because the P320 is effectively cocked when loaded, the P320 is functionally equivalent to a single action pistol with the hammer cocked back, i.e., ready to fire and without any safety features to prevent it from firing.

39. Sig Sauer knows that just by looking at the P320, holding the P320, racking the P320's slide, or even firing the P320, a reasonable consumer could not determine what the action type of the P320 is. In other words, reasonable consumers could not know that the P320 is energized and ready to fire whenever a round is chambered.

40. Sig Sauer has been aware of the P320's Defect since at least 2017 and has maintained that information solely within its possession. Despite the P320's Defect and known design risks, Sig Sauer refuses to warn customers about the P320's dangers or modify its design in any way.

41. Reasonable consumers purchasing a handgun expect that the firearm will not discharge absent a deliberate trigger pull and that its mechanisms are consistent with industry safety standards. Defendant's failure to disclose that the P320's energized firing mechanism despite its short trigger pull and lack of an external safety was material to reasonable consumers' purchasing decisions.

**C. All P320s have the Defect.**

42. While the P320 comes in a variety of sizes and with a variety of optional add-ons, all P320s share the same design and safety characteristics because they all contain the same "fire control unit." According to Sig Sauer, the fire control unit is "the component (frame) that houses a majority of the key functional parts of some handguns; including parts such as the trigger, sear, and slide catch lever; and is the serialized part of the firearm."

43. Similarly, the large, medium, and small sizes of the P320's grip module do not impact the functionality of the P320. Sig Sauer defines the grip module as "a polymer or alloy component of a handgun that houses the primary firing components, including the trigger, sear, hammer, or striker."

44. Additionally, the P320's size, whether full, compact, or subcompact, does not impact the functionality of the P320.

45. The P320 also comes in different models or variants, such as the P320X variant, which has a different shaped handle, but all the variants and models still contain the Defect. For example, the P320X has the same fire control unit as the standard issued P320 and none of the ergonomic differences in the P320X change the way the P320 mechanically works, including its safety features.

46. The different magazine sizes that correspond to different grip sizes of the P320 also do not impact the P320's basic mechanical functions.

47. Ultimately, the different versions of the P320 all mechanically function the same and use the same fire control unit.

**D. The origin of the P320**

48. The P320 was originally based off a Sig Sauer pistol design called the P250. The P250 is a discontinued pistol.

49. Prior to being discontinued, the P250 was removed from consideration in 2010 by the United States Bureau of Alcohol, Tobacco, Firearms, and Explosives due to reliability and safety concerns.

50. In 2012, Sig Sauer pivoted from the P250 to the P320 with the goal of developing "a striker fired pistol capable of using the P250 grip modules," along with other common parts, including a pre-existing inventory of barrels the company had in storage. In other words, Sig Sauer was trying to use the

leftover parts of the P250 in a new firearm—the firearm that would become the P320.

51. Before working on the P320, no one on the P320's design team had ever designed a striker fired pistol.

52. Indeed, Sig Sauer's engineering team was sidelined during the design phase of the P320. Instead, Sig Sauer's marketing department had substantial control over the final design of the pistol.

53. Sig Sauer's engineers did not decide that the P320 should have such a light trigger—that decision was approved as "a marketing call."

54. The P320 was originally designed to have both a thumb safety and a trigger safety. But, again, Sig Sauer's marketing team decided to remove those as standard safety features, and—in the case of the trigger safety—decided not to offer it as an option.

### E. Sig Sauer knew that each P320 is at a "high risk" to "kill [a] person unintentionally."

55. In February 2017—over eight years before the commencement of this suit and before Plaintiffs purchased their P320—Sig Sauer evaluated the safety hazards of the P320 and reported them to the U.S. Army as part of the contract process to supply the P320 as the military's next pistol. The name of

the evaluation was the "MHS Pistol Failure Modes, Effects, and Criticality Analysis (FMECA)."

56. In this context, MHS stood for Modular Handgun System and was the name of the firearm procurement program that Sig Sauer was bidding on. A version of the Sig Sauer P320 with an external safety was adopted as the Army's MHS and was designated as the M17 and M18, depending on the handgun's size. The M17, M18, and consumer P320 all utilize the same fire control unit design and operate the same, though the M17 and M18 are equipped with external safeties.

57. When the FMECA identifies risks, it also identifies the steps taken to mitigate those risks. The mitigation efforts are enumerated in a column entitled "Action Taken (P320)" and each specifically reference the P320.

58. The risk assessment identified the P320 as having a "high" risk for having an accidental discharge that could kill a person unintentionally:

| Potential Failure Mode (results in a loss of "Function" or realization of a hazard) | Potential Cause of Failure (Prob of Occurrenc | O | Potential Effect of Failure (Severity - Function) | S | Risk Assessment Matrix Level |
|---|---|---|---|---|---|
| Pistol accidentally / unintentional discharges | Accidental trigger pull (Operator error) Finger on trigger | C | Kill person unintentionally | 1 | High |
| Pistol accidentally / unintentional discharges | Accidental trigger pull (Foreign Object) | C | Kill person unintentionally | 1 | High |

59. Further, Sig Sauer evaluated those unintentional discharge risks as "likely to occur sometime[] in the life of an item." Put another way, Sig Sauer admits that every P320 unit is likely to suffer an unintended discharge during the life of each pistol.

60. This risk assessment of "catastrophic" is shown on the risk assessment matrix below:

| RISK ASSESSMENT MATRIX | | | | |
|---|---|---|---|---|
| SEVERITY / PROBABILITY | Catastrophic (1) | Critical (2) | Marginal (3) | Negligible (4) |
| Frequent (A) | High | High | Serious | Medium |
| Probable (B) | High | High | Serious | Medium |
| Occasional (C) | High | Serious | Medium | Low |
| Remote (D) | Serious | Medium | Medium | Low |
| Improbable (E) | Medium | Medium | Medium | Low |
| Eliminated (F) | Eliminated | | | |

61. The FMECA identified safety measures that would decrease the P320's likelihood of unintentional discharge, which included employing an external thumb safety and training according to a particular Army field manual.

62. Thus, since at least February of 2017, Sig Sauer has known about the dangerous design of the P320.

63. But even after identifying safety measures to decrease the P320's likelihood of unintentional discharge, and even in the face of the known likelihood, Sig Sauer refuses to adopt an external safety as a standard feature for the P320.

64. Sig Sauer did not disclose the above-described catastrophic risk of the P320 to consumers. To the contrary, it took purposeful measures to prevent this information from entering the public domain.

65. The Defect was known to Sig Sauer but was not reasonably discoverable by ordinary consumers prior to purchase because the Defect arises from the design and internal firing mechanism of the firearm.

**F. Sig Sauer knows that the P320's Defect injures consumers and law enforcement.**

66. Several national news outlets—like ABC News and the Washington Post— have reported on consumers across the country who have been injured due to inadvertent discharges of the P320. *See*, e.g., Detective sues Sig Sauer after she says her holstered P320 handgun nearly killed her, ABC News (Aug. 24, 2021) (accessed May 19, 2026), available at https://abcnews.com/

US/detective-sues-sig-sauer-holstered-p320-handgun-killed/story?id=79605906.

67. The Washington Post reported in April of 2023, "At least 80 people, including police officers, allege they were shot by their SIG Sauer P320 pistols." Popular handgun fires without anyone pulling the trigger, victims say, Wash. Post (April 11, 2023).

68. For its part, Sig Sauer has collected four binders' worth of incident reports concerning the P320 that its senior customer service manager keeps at his home. But the custodian of those binders does not collect incident reports from any other firearm that Sig Sauer manufactures. Thus, even within Sig Sauer, the P320 stands alone.

69. In 2017 or 2018, Sig Sauer developed a new internal reporting process and form to track reports of unintended discharges. This form was developed due to the significant uptick in such reports. Since that time, Sig Sauer has received significantly more reports of unintended discharges about the P320 than it has for other pistols that it sells.

70. In April 2018, CNN inquired of Sig Sauer about reports of the P320 unintendedly discharging. A Sig Sauer executive has testified this "was either before or just at the very beginning of the alleged guns going off by themselves."

71. Reports of unintended discharge of the P320 continued. On August 26, 2021, Sig Sauer received four reports of unintended discharge in a single hour, with two more such reports in the company's email queue. Of these six total reports, five were for the P320.

72. Senior executive leadership at Sig Sauer was alerted to this surge in reports of P320 unintended discharges.

73. Sig Sauer states that it has received hundreds of complaints of unintended discharges of the P320, far more than any other pistol it manufactures. And several have been captured on video and reported in the media:

Police1, *Conn. police department to replace all officers' handguns due to safety concerns*.




(July 28, 2023) (accessed Oct. 7, 2025), available at https://www.police1.com/police-products/firearms/articles/conn-police-department-to-replace-all-officers-handguns-due-to-safety-concerns-shVuKA0s4AIcvJze/

74. Sig Sauer employees have seen these new reports and videos but dismiss them as "anti-gun" or perhaps fraudulent, even comparing them to videos of Bigfoot.

75. Indeed, Sig Sauer's response to customer complaints and media reports about the P320 has been a strategy of denial. Sig Sauer's internal documents show that the company blames the "anti-gun media" (Option 1), the injured officers and their lawyers (Option 2), or even its competitor, Glock (Option 3):

**Statement 07/27**

Option 1 (News):
We are disappointed, but not surprised, that a liberal, anti-gun media outlet like ABC has chosen to report and sensationalize frivolous lawsuits being propagated by trial lawyers as newsworthy.

Option 2 (Trial Lawyers)
Once again, this lawsuit is a result of unsupported allegations and claims being propagated by trial attorneys seeking personal financial gain for a negligent discharge caused by the (insert officer if LE) mishandling and/or misuse of the firearm.

Option 3: (GLOCK)
We are not surprised that our competitor has decided to participate in sensationalizing false claims that seek to undermine the success of the P320. This is nothing more than an act of desperation due to their inability to prove themselves in a head-to-head match up with us.

Sig Sauer email dated July 27, 2021, and attachment (emphasis in original).

76. Given these concerns, several law enforcement agencies have decided the P320 is no longer safe to use. This includes the recent ban issued by the U.S. Immigration and Customs Enforcement (ICE). The Surprising FBI evaluation and ICE ban of the troubled Sig Sauer P320, Yahoo News (July 10, 2025) (accessed May 19, 2026), available at https://www.yahoo.com/news/surprising-fbi-evaluation-ice-ban-153437096.html.

77. ICE issued a memo to remove the P320, written by Madison D. Sheahan, Deputy Director at ICE, with the subject titled "Discontinuation of Approval for ICE Authorized Officers to Carry All Models of the SIG Sauer P320

and Direction to Purchase Glock 19s as Replacement Duty Handguns for Affected ICE Officers and All ICE AOs Moving Forward."[1]

78. Likewise, the National Law Enforcement Firearms Instructors Association recently banned all P320 models from use in all of its training courses. Nation's Law Enforcement Instructors Declare SIG P320 Unsafe for Training, SOFREP (July 29, 2025) (accessed May 19, 2026), available at https://sofrep.com/news/nations-law-enforcement-instructors-declare-sig-p320-unsafe-for-training/.

79. Other agencies that have removed the P320 as their duty weapon include, but are not limited to:

- **Chicago Police Department**. *Sig Sauer's P320 banned by Chicago Police Department and other law enforcement agencies*, WE ARE THE MIGHTY (June 25, 2025) (referencing events from 2017, 2019, 2022, 2024, and 2025) (last accessed May 19, 2026), available at https://www.yahoo.com/news/sig-sauer-p320-banned-chicago-154300609.html.

- **Milwaukee, Wisconsin Police Department**. *Milwaukee Police to replace all officer weapons following 'unexpected' discharges*, Spectrum News 1 (Oct. 31, 2022) (referencing events from 2020) (accessed May 19, 2026), available at https://spectrumnews1.com/wi/milwaukee/news/2022/10/31/milwaukee-police-to-replace-all-officer-weapons-following-unexpected-discharges-.

[1] Available at https://www.wearethemighty.com/wp-content/uploads/2025/07/IMG_3294.jpeg (accessed May 19, 2026).

- **San Antonio, Texas Police Department**. *SAPD is suspending use of the Sig Sauer P320 handgun. Here's why.*, KENS5 CBS News (July 29, 2025) (referencing events from 2024 and 2025) (accessed May 19, 2026), available at https://www.kens5.com/article/news/local/law-enforcement/sig-sauer-p320-safety-san-antonio-police-sapd-texas/273-698b04f6-61de-4944-868f-8d293773de1f.

- **Houston, Texas Police Department**. *Houston Police Department suspends use of P-320 handguns amid concerns about unintentional discharges*, Houston Public Media (Aug. 5, 2025) (accessed May 19, 2026), available at https://www.houstonpublicmedia.org/articles/police/2025/08/05/527915/houston-police-department-rolls-back-p-320-handguns-after-officers-unintentional-discharge/.

- **Denver, Colorado Police Department**. *A Gun Deemed Too Dangerous for Cops, but Fine for Civilians*, The Trace (May 19, 2025) (referencing events in 2022 and 2024) (accessed May 19, 2026) available at https://www.thetrace.org/2025/05/sig-sauer-p320-police-resale-public/.

- **Oklahoma City, Oklahoma Police Department**. *OKCPD abandoned this handgun months before latest fatal accident at USAF base*, The Oklahoman (Aug. 1, 2025) (accessed May 19, 2026) available at https://www.oklahoman.com/story/news/state/2025/08/01/oklahoma-police-stopped-using-sig-sauer-before-fatal-usaf-accident/85438054007/?gnt-cfr=1&gca-cat=p&gca-uir=false&gca-epti=z1174xxp001850c001850e1174xxv001622&gca-ft=176&gca-ds=sophi.

- **Philadelphia Transit Police**. *Philadelphia Transit Police Scrap SIG Sauer Pistols After Incident*, New Hampshire Public Radio (September 11, 2019) (referencing events in 2019) (accessed May 19, 2026), available at https://www.nhpr.org/post/philadelphia-transit-police-scrap-sig-sauer-pistols-after-incident.

- **Ventura County, California Sheriff's Office**. *Sheriff's Office, Oxnard Police Department to buy new handguns. Here's why*, VC Star (Oct. 20, 2025) (accessed May 19, 2026), available at

https://www.vcstar.com/story/news/local/2025/10/20/local-police-to-phase-out-current-handguns-heres-why/86713430007/?gnt-cfr=1&gca-cat=p&gca-uir=false&gca-epti=z11xx01p119950c119950v11xx01&gca-ft=249&gca-ds=sophi.

- **North Dakota Highway Patrol**. *Factory recall: Safety warning with Sig Sauer P320 pistol*, Blue Line (Dec. 15, 2017) (accessed May 19, 2026), available at https://www.blueline.ca/factory-recall-safety-warning-with-sig-sauer-p320-pistol-5052/#:~:text=Other%20agencies%20such%20as%20North,sent%20back%20to%20the%20factory.

- **Montville, Connecticut Police Department**. *Conn. Police department to replace all officers' handguns due to safety concerns*, Police 1 (July 28, 2023) (referencing events in 2023) (accessed May 19, 2026), available at https://www.police1.com/police-products/firearms/articles/conn-police-department-to-replace-all-officers-handguns-due-to-safety-concerns-shVuKA0s4AIcvJze/.

- **Brookfield, Connecticut Police Department**. *Some Connecticut police are replacing a handgun that can reportedly fire without being triggered*, Newstimes (April 30, 2024) (referencing events in 2017 and 2022) (accessed May 19, 2026), available at https://www.newstimes.com/local/article/ct-police-sig-sauer-guns-safety-19404483.php.

- **Orange, Connecticut Police Department**. *Some Connecticut police are replacing a handgun that can reportedly fire without being triggered*, Newstimes (April 30, 2024) (referencing events in 2017 and 2022) (accessed May 19, 2026), available at https://www.newstimes.com/local/article/ct-police-sig-sauer-guns-safety-19404483.php.

- **Bridge City, Texas Police Department**. *Lawsuit: Semi-automatic police service gun goes off by itself, nearly killing detective*, ABC News (August 25, 2021) (referencing events in 2020) (accessed May 19, 2026), available at https://abc11.com/sig-sauer-lawsuit-p320-pistol-brittney-hilton-accidental-discharge/10974219/.

- **Burnet, Texas Police Department**. *BPD transitions to new duty gun to replace problematic firearm,* Daily Trib (Oct. 24, 2024) (referencing events in 2024) (accessed May 19, 2026), available at https://www.dailytrib.com/2024/10/24/bpd-transitions-to-new-duty-gun-to-replace-problematic-firearm/.

- **Marble Falls, Texas Police Department**. *MFPD recalls sidearms after accidental gun discharge at school*, Daily Trib (Sep. 24, 2024) (accessed May 19, 2026), available at https://www.dailytrib.com/2024/09/24/mfisd-officer-injured-in-accidental-gun-discharge-on-campus/.

- **Indian River County, Florida Sheriff's Office**. *Indian River County Sheriff's Office switches to new firearm after deputy injured in unintended discharge*, 5 WPTV West Palm Beach (Dec. 4, 2023) (referencing events in 2023) (accessed May 19, 2026), available at https://www.wptv.com/news/treasure-coast/region-indian-river-county/indian-river-county-sheriffs-office-new-weapons-12-4-23.

80. These concerns continue to mount. In October 2024, the Washington State Criminal Justice Training Commission issued a memo stating that it "has become aware of a serious safety concern with the Sig Sauer P320," and that "during a Basic Law Enforcement Academy (BLEA) firearms training, a student experienced a premature discharge with their agency issued firearm," which led the Commission to discover a separate incident involving the P320 in Washington state earlier in 2024. Accordingly, the Commission decided that it "will not authorize the use of the Sig Sauer P320 in our agency-owned or contracted training facilities until further notice."

81. The WSCJTC's investigation also led the Oregon Department of Public Safety Standards and Training to ban the P320 at its facilities.

82. And in November 2024, a CBS news outlet reported on—and published video footage of—an officer who was nearly killed when the P320 discharged in his holster while he was walking. *It happened again: Texas officer injured by holstered SIG SAUER P320*, CBS | Austin (Nov. 1, 2024) (accessed Mar. 13, 2026), available at May 19 https://cbsaustin.com/news/local/it-happened-again-texas-officer-injured-by-holstered-sig-sauer-p320:




https://cbsaustin.com/news/local/it-happened-again-texas-officer-injured-by-holstered-sig-sauer-p320

## G. Sig Sauer Doubles Down on the P320

83. Despite all these warning signs—including its own internal analysis—Sig Sauer's website formerly touted the P320's safety by stating:

> We've designed safety elements into every necessary feature on this pistol. From the trigger to the striker and even the magazine, the P320 won't fire unless you want it to.

*Trigger warning*, CNN (June 6, 2018) (accessed May 19, 2026), available at https://www.cnn.com/interactive/2018/06/investigates/sig-sauer-p320-drop-fire/.

84. Now, the P320's landing page has a bolded, fully capitalized header that states: "SAFETY WITHOUT COMPROMISE." (accessed May 19, 2026), available at https://www.sigsauer.com/firearms/pistols/p320.html.

85. Underneath the heading, Sig Sauer states, "Safety isn't negotiable. The P320 maximizes peace of mind with a robust safety system . . . ." *Id.*

86. In March 2025, Sig Sauer launched a social media campaign across various platforms exclaiming, "THE TRUTH ABOUT THE P320," and stating that, when it comes to the P320, "It ends today."




87. In other slides, the same post casts aspersions against anyone drawing attention to the P320's serious problems—calling them "clickbait farming, engagement hacking grifters" and the "anti-gun mob" while accusing anybody who challenges the P320's safety of engaging in "lawfare." The full post reads:




88. Despite Sig Sauer's position on social media, in the U.S. District Court for the District of New Hampshire alone, 64 plaintiffs filed consolidated complaints in June of 2024, alleging they were injured by inadvertent P320 discharges. See In Re: Sig Sauer P320 Products Liability Litigation, No. 22-CV-536 (D.N.H.), ECF Nos. 63-72.

89. And in a related action, another 39 individuals have filed a consolidated action against Sig Sauer. *See Anderson et al. v. Sig Sauer, Inc.*, No. 25-CV-113 (D.N.H.).

90. To date, injured individuals have filed no fewer than 32 additional cases against Sig Sauer in federal and state courts across the country, alleging inadvertent discharge of the P320, with many of the victims being law enforcement agents:

| Personal Injury Suits Against Sig Sauer Concerning P320 | | | | |
|---|---|---|---|---|
| **Case Name[2]** | **Law Enforcement Plaintiff** | **Jurisdiction** | **Case No.** | **Date Filed** |
| *Vadnais v. Sig Sauer** | Sheriff | E.D. Va. | 18-CV-540 | May 4, 2018 |
| *Mayes v. Sig Sauer** | Former law enforcement | W.D. Ky. | 19-CV-146 | Oct. 16, 2019 |
| *Frankenberry v. Sig Sauer** | Former Police Officer | D. S.C. | 19-CV-2990 | Oct. 22, 2019 |
| *Jinn v. Sig Sauer** | Homeland Security Special Agent | S.D.N.Y. | 20-CV-1122 | Feb. 10, 2020 |
| *Hoefs v. Sig Sauer** | x | W.D. Wash. | 20-CV-5173 | Feb. 26, 2020 |
| *Williams v. Sig Sauer** | x | E.D. Ky. | 20-CV-78 | May 22, 2020 |
| *Guay v. Sig Sauer** | x | D. N.H. | 20-CV-736 | July 2, 2020 |
| *Powers v. Sig Sauer** | Former U.S. Sergeant | M.D. Fla. | 20-CV-2026 | Aug. 28, 2020 |
| *Haynes v. Sig Sauer** | Police Officer | N.D. Ga. | 20-CV-4218 | Oct. 13, 2020 |
| *Schneider v. Sig Sauer** | x | D. N.H. | 20-CV-1190 | Dec. 18, 2020 |

[2] Case names denoted with an "*" are no longer pending.

| Personal Injury Suits Against Sig Sauer Concerning P320 | | | | |
|---|---|---|---|---|
| **Case Name[2]** | **Law Enforcement Plaintiff** | **Jurisdiction** | **Case No.** | **Date Filed** |
| *Watson v. Sig Sauer** | x | N.D. Tex. | 21-CV-106 | Jan. 29, 2021 |
| *Slatowski v. Sig Sauer** | Deportation Officer with ICE | E.D. Pa. | 21-CV-729 | Feb. 17, 2021 |
| *Campbell v. Sig Sauer** | | W.D. Mo. | 21-CV-5047 | May 19, 2021 |
| *Ahern v. Sig Sauer* | Detective Lieutenant | D. Mass. | 21-CV-11007 | June 16, 2021 |
| *Hilton v. Sig Sauer** | Detective | E.D. Tex. | 21-CV-441 | Aug. 16, 2021 |
| *Collette v. Sig Sauer** | Police Officer | D. Mass. | 21-CV-11392 | Aug. 25, 2021 |
| *Lang v. Sig Sauer** | x | N.D. Ga. | 21-CV-4196 | Oct. 11, 2021 |
| *Herman v. Sig Sauer** | x | W.D. Okla. | 21-CV-1038 | Oct. 25, 2021 |
| *Colwell v. Sig Sauer** | Police Officer | N.D.N.Y. | 21-CV-1200 | Nov. 2, 2021 |
| *Davis v. Sig Sauer** | | E.D. Ky. | 22-CV-10 | Feb. 1, 2022 |
| *Catatao v. Sig Sauer** | Police Officer | D. Mass. | 22-CV-10620 | April 26, 2022 |
| *White v. Sig Sauer** | Police Officer | N.D. Ga. | 22-CV-1985 | May 18, 2022 |
| *Williams v. Sig Sauer** | x | E.D. N.C. | 22-CV-48 | May 18, 2022 |
| *Winingham v. Sig Sauer** | x | D. Ariz. | 22-CV-1037 | June 16, 2022 |
| *Desrosiers v. Sig Sauer* | Police Officer | D. Mass. | 22-CV-11674 | Oct. 3, 2022 |

| **Personal Injury Suits Against Sig Sauer Concerning P320** | | | | |
|---|---|---|---|---|
| **Case Name[2]** | **Law Enforcement Plaintiff** | **Jurisdiction** | **Case No.** | **Date Filed** |
| *Valentino v. Sig Sauer** | Special Agent, Homeland Security | D. N.J. | 23-CV-1309 | March 8, 2023 |
| *Hall v. Sig Sauer* | Police Officer | M.D. Pa. | 23-CV-978 | June 13, 2023 |
| *Cole v. Sig Sauer* | Sheriff | D. Maine | 23-CV-327 | Aug. 23, 2023 |
| *Jantz v. Sig Sauer* | x | D. Colo. | 24-CV-15 | Jan. 3, 2024 |
| *Barmore v. Sig Sauer** | Police Officer | W.D. La. | 24-CV-56 | Jan. 16, 2024 |
| *Torres v. Sig Sauer* | Police Officer | D. P.R. | 24-CV-1441 | Sept. 20, 2024 |
| *Gomelskaya v. Sig Sauer* | x | Penn. Cty. Ct. of Common Pleas | 241200470 | Dec. 3, 2024 |
| *Currington, et al. v. Sig Sauer* | Police Officers | D.N.H. | 25-CV-26 | Jan. 13, 2025 |
| *Orrson v. Sig Sauer* | Sheriff | S.D. Tex. | 25-CV-1776 | April 17, 2025 |

91. These cases are often tragic. For example, in *Gomelskaya*, the underlying incident involved the P320 inadvertently discharging into a man's femoral artery. The victim bled out and died. The victim's widow filed the case individually and on behalf of her deceased husband's estate.

92. On June 20, 2024, a jury sitting in the U.S. District Court for the Northern District of Georgia awarded a man $2.35 million for pain, suffering, and medical damages, finding that the P320 was defectively designed after it shot through the man's leg while he pulled it out of his holster. *See* Verdict Form, *Lang v. Sig Sauer, Inc.*, No. 21-CV-4196 (June 20, 2024), ECF No. 131-1. Answering special interrogatories, the jury specifically found that:

a. Sig Sauer supplied "a product that was defectively designed at the time the product left the defendant's control because it did not possess a tabbed trigger,"

b. "[T]he defective design of the P320 cause[d] harm to Plaintiff,"

c. Sig Sauer supplied "a product that was defective because adequate warnings about the possibility of unintended discharges were not provided,"

d. "The absence of warnings cause[d] harm to Plaintiff,"

e. Sig Sauer was "negligent for selling the P320 without a tabbed trigger,"

f. Sig Sauer's "negligence in the sale of the P320 cause[d] harm to Plaintiff,"

g. Sig Sauer was "negligent for failing to warn customers of the risk of the P320 unintentionally discharging,"

h. Sig Sauer's "failure to warn customers of the risk of unintended discharge cause[d] harm to Plaintiff."

93. On November 20, 2024, a jury sitting in the Philadelphia County, Pennsylvania Court of Common Pleas awarded a man compensatory and punitive damages finding that the P320 was defectively designed, though the punitive damages were later vacated. *See* Verdict Form, *Abrahams v. Sig Sauer, Inc*., No. 220601213 (Nov. 20, 2024). Answering special interrogatories, the jury specifically found that:

a. "Sig Sauer Inc.'s P320 involved in the subject incident [was] defectively designed,"

b. "The defective design of the P320 [was] a factual cause of harm to Plaintiff,"

c. "Sig Sauer Inc. [was] negligent for its design and distribution of the P320,"

d. "Sig Sauer Inc.'s negligence [was] a factual cause of harm to Plaintiff," and

e. "Sig Sauer, Inc. [was] negligent for failing to warn customers of the risk of the P320 unintendedly discharging."

94. On July 30, 2025, a jury sitting in the U.S. District Court for the District of Massachusetts ultimately found for Sig Sauer due to the plaintiff's

own intervening actions. *See* Verdict Form, *Desrosiers v. Sig Sauer, Inc*., No. 1:22-cv-11674-PBS (July 30, 2025). But answering special interrogatories, the jury specifically found that the plaintiff proved by a preponderance of the evidence:

a. "Sig Sauer, Inc. breached the implied warranty of merchantability by defectively designing the P320 pistol,"

b. "Sig Sauer, Inc.'s defective design of the P320 pistol caused him injury," and

c. "Sig Sauer, Inc. breached the implied warranty of merchantability by failing to give adequate warnings regarding risks associated with the P320 pistol."

**H. The P320 is unique in the firearms industry.**

95. Pistols that are comparable to the P320, like the Glock 17 or the Smith & Wesson M&P, use a combination of longer, heavier trigger pulls with a trigger safety to require more intentionality to fire.

96. Other comparable pistols, like most model 1911s, use a combination of a grip safety and an external thumb safety along with a longer, heavier trigger pull to require more intentionality to fire. Many model 1911s also include a de-cocking lever to safely de-energize the weapon before holstering. The Walther P99 and the Sig Sauer P229 also incorporate de-cocking levers.

97. Indeed, a firearms expert has conducted a survey of over 45 comparable firearms and confirmed that the P320 is the only firearm of its type to contain all three components of the Defect in one model. In this respect, the P320 stands alone within the firearms industry.

**I. Sig Sauer uniformly conceals the Defect from consumers.**

98. Sig Sauer is aware that the company knows more about the P320 than a reasonable consumer does. Typical consumers do not have the scientific or engineering background necessary to determine whether the P320's internal mechanisms are defective.

99. And Sig Sauer designed the P320 with knowledge that the product was going to be sold to the general public for a price, and it expected that consumers would purchase the P320 for their personal use, including everyday carry. For instance, Sig Sauer knows that users routinely keep a round chambered in their pistol.

100. Even though Sig Sauer knows the P320 is harming individuals across the country, it has not made any design changes to the P320 in the last several years. Instead, Sig Sauer engages in the dissemination of counter-information in response to stories concerning inadvertent discharges of the P320.

101. Sig Sauer purchases advertisements that are delivered to consumers through print advertising in magazines, television, and social media. It purchases national ad buys for its advertisements in magazines and Plaintiffs were unaware of any limitation to those advertisements being distributed within Florida.

102. In addition to omitting information concerning the design of the P320, the advertisements further conceal the Defect by equating the standard P320 (with no manual safety features) with the military-issued M17 and M18 (both of which include an external safety). Simply put, Sig Sauer attempts to leverage its relationship with the Department of Defense to sell more pistols to civilian consumers and often relies on military iconography to achieve that goal, even though the military and civilian versions of the pistols are markedly different.

103. For example, the screen shot below is from Sig Sauer's P320 homepage—not the page specifically dedicated to the M17 or M18—where Sig Sauer depicts a man in military combat gear brandishing the P320, which is described by Sig Sauer as "CHOSEN THE WORLD OVER":




*See P320 Pistols*, Sig Sauer (accessed Oct. 16, 2024), available at https://www.sigsauer.com/ firearms/pistols/p320.html.

104. The following example demonstrates how Sig Sauer advertises the P320 specifically—without reference to the M17 or M18—by depicting an individual in military combat fatigues on the P320 landing page, with the statement that the P320 is "Chosen by all branches of the U.S. military":



105. Another example is the following advertisement for the M17 specifically that states it is "BASED ON THE P320" while letting consumers know that the "M17 IS THE U.S. ARMY'S CHOICE," and even displays the U.S. Army's logo, but again completely omits that the Army-issued M17 includes an external safety whereas the standard P320 does not:




## J. The proposed class is uniformly damaged by Sig Sauer's conduct.

106. The P320 pistols that Florida consumers purchased were defective at the time of acquisition. As a result, consumers overpaid for the products,

because the Defect differentiated the P320 from the accepted quality and safety standards for new handguns.

107. The Defect exists in every P320 at the time of manufacture and sale, regardless of whether a particular firearm has yet experienced an unintended discharge.

108. Firearms experts confirm that the Defect is manifested in every P320 and the design is not a "potential defect."

109. Thus, Sig Sauer failed to fulfill its bargain with consumers who agreed to purchase the P320 because those pistols were less valuable than what consumers reasonably expected to receive.

110. A uniform damage model equally applicable to all P320s—proffered and supported by an economist—will allow a jury to measure overpayment harm suffered by class members as a result of the alleged Defect.

111. Sig Sauer's marketing, promotion, and editorial comments about the P320 in the United States are targeted to a nationwide audience. As such, Sig Sauer communicated with Plaintiffs in the same way as it communicated with other Florida consumers who purchased a P320.

112. Based on the FMECA, the number of injury-related lawsuits filed against Sig Sauer based on an unintended discharge of the P320, consumer complaints directly to Sig Sauer, and law enforcement agencies discontinuing

their use of the P320 due to safety concerns, Sig Sauer knew or should have known that reasonable consumers would expect to be advised of the dangers associated with the P320 before purchasing a handgun.

## IV. EQUITABLE TOLLING

113. The running of the statute of limitations is tolled due to equitable tolling. Sig Sauer is estopped from relying on any statutes of limitation or repose by virtue of its acts of fraudulent concealment, through affirmative misrepresentations and omissions to Plaintiffs and putative class members of the P320's Defect. Sig Sauer affirmatively withheld and misrepresented facts concerning the safety of the P320. As a result of Sig Sauer's misrepresentations and concealment, Plaintiffs and putative class members were unaware, and could not have known or have learned through reasonable diligence, of facts related to Sig Sauer's misrepresentations or omissions, that the P320 was defective and that consumers were being harmed as a direct and proximate result of the wrongful acts and/or omissions of Sig Sauer.

114. Given Sig Sauer's affirmative actions of concealment by failing to disclose this known but non-public information about the P320's Defect—information over which Sig Sauer had exclusive control—and because Plaintiffs and putative class members could not reasonably have known of the P320's Defect, Sig Sauer is estopped from relying on any statutes of limitations or

repose that might otherwise be applicable to the claims asserted herein during the pendency of its concealment.

115. Plaintiffs and Class members could not reasonably have discovered the Defect prior to purchase because the Defect involves firing mechanics not observable without specialized testing or engineering analysis.

## V. CLASS ALLEGATIONS

116. Plaintiffs, on behalf of themselves and the proposed Class, re-allege the foregoing paragraphs as if fully set forth herein.

117. Plaintiffs seek to represent the following proposed Class:

> **All persons who purchased a Sig Sauer model P320 pistol without an external thumb safety in the state of Florida from May 20, 2022, through the present, in addition to any period of court-ordered equitable tolling.**[3]

118. This action has been brought and may properly be maintained on behalf of the Class proposed above under the criteria of Federal Rule of Civil Procedure Rule 23.

---

[3] The following are excluded from the class: (1) individuals who have filed an individual action against Sig Sauer related to the P320; (2) individuals who no longer own a P320 pistol without an external thumb safety; (3) Sig Sauer, including any affiliate, parent, or subsidiary of Sig Sauer; (4) any judge to whom this case is assigned, his or her spouse, and all persons within the third degree of relationship to either of them, as well as the spouses of such persons; and (5) members of the judge's staff.

119. **Numerosity**. Sig Sauer sold thousands of P320 firearms, including a substantial number in Florida. Members of the proposed Class likely number in the hundreds or thousands and are thus too numerous to practically join in a single action. Class members may be notified of the pendency of this action by mail, supplemented by published notice (if deemed necessary or appropriate by the Court).

120. **Commonality and Predominance**. Common questions of law and fact exist as to all members of the proposed Class and predominate over questions affecting only individual class members. These common questions include:

- whether the P320 contains the alleged Defect;
- whether Sig Sauer knew or should have known that the P320 contains the alleged Defect;
- whether the P320's alleged Defect makes it unreasonably dangerous for its reasonably anticipated use;
- whether Sig Sauer has a practice of failing to inform consumers of the P320's alleged Defect;
- whether Sig Sauer has a practice of failing to inform consumers that the P320 was of a different design than the military version of the pistol;
- whether Sig Sauer's practices are deceptive;
- whether Sig Sauer's practices are unfair;
- whether Sig Sauer's practices impact the public interest;

- whether Sig Sauer's practices occurred in the course of Sig Sauer's trade or commerce;
- whether Plaintiffs and the Class are entitled to damages; and
- whether Plaintiffs and the Class are entitled to injunctive relief.

The foregoing questions are common to the class because they will be answered by scrutinizing Sig Sauer's conduct in relation to the P320 rather than the conduct of the individual class members.

121. **Typicality**. Plaintiffs' claims are typical of the claims of the proposed Class because they, like class members, purchased the same firearm containing the same Defect in Florida within the class period; this similarity gives rise to substantially the same claims as the proposed Class.

122. **Adequacy**. Plaintiffs are adequate representatives of the proposed Class because their interests do not conflict with the interests of the members of the Class that they seek to represent. Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs will prosecute this action vigorously on behalf of the proposed class. The interests of members of the class will be fairly and adequately protected by Plaintiffs and their counsel.

123. **Superiority**. A class action is superior to other available means for the fair and efficient adjudication of this dispute. The injury suffered by each Class member, while meaningful on an individual basis, is not of such

magnitude as to make the prosecution of individual actions against Sig Sauer economically feasible. Even if Class members themselves could afford such individualized litigation, the court system could not. In addition to the burden and expense of managing many actions arising from the P320 pistol's alleged Defect, individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

124. In the alternative, the proposed Class may be certified because:

a. the prosecution of separate actions by the individual members of the proposed Class would create a risk of inconsistent or varying adjudication with respect to individual Class members which would establish incompatible standards of conduct for Sig Sauer;

b. the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

c. Sig Sauer has acted or refused to act on grounds generally applicable to the proposed Class, thereby making appropriate final and injunctive relief with respect to the members of the proposed Class as a whole.

**COUNT I**
**Violation of the FDUTPA - Unfair Acts or Practices**
**Fla. Stat. Ann. § 501.201 *et seq.***
**(Plaintiffs Individually and on behalf of the proposed Class)**

125. Plaintiffs, on behalf of themselves and the proposed Class, re-allege the foregoing paragraphs as if fully set forth herein.

126. The Florida Deceptive and Unfair Trade Practices Act.

127. ("FDUTPA") prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. Ann. §501.204(1).

128. The FDUTPA is to be liberally construed "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. Ann. §501.202(2).

129. In construing the provisions of the FDUTPA, "due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to [§] 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. [§] 45(a)(1) as of July 1, 2017." Fla. Stat. Ann. §501.204(2).

130. Plaintiffs and the Class members are "[c]onsumer[s]" and "[i]nterested part[ies] or person[s]" as defined by the FDUTPA. See Fla. Stat. Ann. §501.203(6)-(7).

131. Sig Sauer engaged in "[t]rade or commerce" as defined by the FDUTPA through the sale of assets, namely the P320, and engaging in commerce that both directly and indirectly affected the people of the state of Florida, and thus, is capable of injuring a substantial portion of the public. *See* Fla. Stat. Ann. §501.203(8).

132. Sig Sauer, directly or through its agents, employees, and/or subsidiaries, advertised the P320 on its websites, through social media, podcasts, YouTube videos and related content, and national advertising campaign, but did not disclose the Defect or the dangers associated with the Defect to Plaintiffs or proposed Class members.

133. Furthermore, Sig Sauer touts that the military adopted the P320 as its service firearm—thereby giving the pistol credibility among gun enthusiasts—but omits that the military version of the firearm (the M17 and M18) contains several design modifications absent the consumer version of the pistol.

134. Sig Sauer, directly or through its agents, employees, and/or subsidiaries, violated the FDUTPA by knowingly and intentionally

misrepresenting, omitting, concealing, and failing to disclose material facts on the labels and warnings for the P320, including that such firearms were inherently defective, unreasonably dangerous, not fit to be used for their intended purpose, contained the Defect, or the dangers associated with the Defect.

135. Sig Sauer, directly or through its agents, employees, and/or subsidiaries, violated the FDUTPA by knowingly and intentionally misrepresenting, omitting, concealing, and failing to disclose material facts on the labels and warnings for the P320, including that the design of the P320 rendered it an energized, fully ready-to-discharge pistol, with a short, light trigger pull, without any physical restraint against the trigger moving anytime a round was chambered.

136. Sig Sauer, directly or through its agents, employees, and/or subsidiaries, violated the FDUTPA by knowingly and intentionally misrepresenting, omitting, concealing, and failing to disclose material facts on the labels and warnings for the P320, including that the design of the P320 rendered every P320 without an external safety the functional equivalent of a loaded revolver with the hammer cocked back at all times a round was chambered

137. Sig Sauer, directly or through its agents, employees, and/or subsidiaries, violated the FDUTPA by knowingly and intentionally misrepresenting, omitting, concealing, and failing to disclose material facts in its marketing, advertising, and promotions for the P320, including that: such firearms were inherently defective, unreasonably dangerous, not fit to be used for their intended purpose, contained the Defect, or the dangers associated with the Defect.

138. Sig Sauer, directly or through its agents, employees, and/or subsidiaries, violated the FDUTPA by knowingly and intentionally misrepresenting, omitting, concealing, and failing to disclose material facts in its marketing, advertising, and promotions for the P320 including that the design of the P320 rendered it an energized, fully ready-to-discharge pistol, with a short, light trigger pull, without any physical restraint against the trigger moving anytime a round was chambered.

139. Sig Sauer, directly or through its agents, employees, and/or subsidiaries, violated the FDUTPA by knowingly and intentionally misrepresenting, omitting, concealing, and failing to disclose material facts in its marketing, advertising, and promotions for the P320 including that the design of the P320 rendered every P320 without an external safety the

functional equivalent of a loaded revolver with the hammer cocked back at all times a round was chambered.

140. Specifically, by knowingly and intentionally misrepresenting, omitting, concealing, and failing to disclose material facts regarding the P320, as detailed above, Sig Sauer engaged in one or more unfair or deceptive acts or practices in the conduct of trade or commerce, in violation of the FDUTPA.

141. Sig Sauer's misrepresentations and omissions regarding the inherently defective and unreasonably dangerous nature of the P320 were disseminated to Plaintiffs and the Class members in a uniform manner.

142. Sig Sauer's misrepresentations and omissions regarding the inherently defective and unreasonably dangerous nature of the P320 would deceive a reasonable consumer about the quality and value of the P320.

143. Sig Sauer's omissions concerning the safety of the Defect were material because they were likely to deceive a reasonable consumer into purchasing a P320 without being aware of the dangerous nature of the Defect.

144. Sig Sauer's conduct is immoral, unethical, oppressive, or unscrupulous because the failure to disclose such serious safety risks places consumers in serious danger.

145. At the time that Sig Sauer designed, manufactured, and marketed the P320, it knew or should have known that the Defect posed serious safety risks to consumers like Plaintiffs and the proposed Class members.

146. Nonetheless, Sig Sauer concealed its knowledge of the Defect from consumers, including Plaintiffs and members of the proposed Class.

147. To this day, Sig Sauer continues to violate the FDUTPA by concealing the Defect, by failing to issue a recall, by failing to notify customers of the serious safety issues posed by the Defect, and by failing to offer cost-free repair or replacement of the Defect.

148. These acts or practices are deceptive within the meaning of the FDUTPA because they have the capacity to deceive Florida consumers. Indeed, this claim is based on deceptive marketing and nondisclosure, not simply the existence of Defect.

149. Sig Sauer's unfair or deceptive acts or practices, including its misrepresentations, concealments, omissions, and suppressions of material facts, as alleged herein, had a tendency or capacity to mislead and create a false impression in consumers' minds, and were likely to and, in fact, did deceive reasonable consumers, including Plaintiffs and the Class members, about: (i) the inherently defective and unreasonably dangerous nature of the P320; (ii)

the Defect and the dangers associated with the Defect; and (iii) the safety of the P320 if used with a chambered round.

150. The facts regarding the P320 that Sig Sauer knowingly and intentionally misrepresented, omitted, concealed, and failed to disclose would be considered material by a reasonable consumer, and they were, in fact, material to Plaintiffs and the Class members, who consider such facts to be important to their purchase decisions with respect to firearms in general and the P320 in particular.

151. Plaintiffs and the Class members were aggrieved by Sig Sauer's violations of the FDUTPA because they suffered ascertainable loss and actual damages as a direct and proximate result of Sig Sauer's knowing and intentional misrepresentations, omissions, concealments, and failures to disclose material facts as set forth above.

152. A P320 without an external safety can be retrofitted to include such a feature but this requires parts, time, and gunsmithing skill or experience beyond the ken of a typical, reasonable consumer.

153. Plaintiffs and the Class members were deceived by Sig Sauer's misrepresentations, omissions, concealments, and failures to disclose material facts regarding the P320. Had Sig Sauer not engaged in the deceptive acts and practices alleged herein, Plaintiffs and the Class members would have paid

substantially less or would not have purchased the P320, and, thus, they did not receive the benefit of the bargain.

154. The actual damages suffered by Plaintiffs and Class members equal the difference between the value of the P320 as sold and the value it would have had if it had been designed and marketed without the omitted or concealed Defect.

155. As a direct and proximate result of Sig Sauer's unfair acts and practices, Plaintiffs and the proposed Class members have suffered an injury in fact and lost money. Had Sig Sauer disclosed the true quality and defective nature of the P320 firearm, Plaintiffs and Class members would not have purchased them or would have paid substantially less for them.

156. As a direct result of Defendant's concealment of the Defect, the P320 had a market value materially lower than the price consumers paid. Had the Defect been disclosed, the market price of the P320 would have been substantially lower or consumers would not have purchased the product at all.

157. Sig Sauer's omissions concerning the safety of the P320 and the nature of the Defect impact the public interest because Sig Sauer is concealing from the public the dangerous nature of the P320. These omissions lead to and have caused serious personal injuries to consumers and have deceived a substantial portion of the Florida public.

158. Sig Sauer's violations present a continuing risk to Plaintiffs and the Class members, as well as to the general public. Sig Sauer's unlawful acts and practices complained of herein affect the public interest because it has: (1) injured consumers; (2) had the capacity to injure other persons; and (3) currently has the capacity to injure other persons.

159. As a result of Sig Sauer's violations of the FDUTPA, as alleged herein, Plaintiffs and the Class members seek actual damages, costs, attorneys' fees, and any other just and proper relief available under the FDUTPA.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter a judgment awarding the following relief:

A. An order certifying the proposed Class and appointing Plaintiffs and their counsel to represent the Class;

B. An order awarding Plaintiffs and the Class members their actual damages, and/or any other form of monetary relief provided by and pursuant to law; and

C. An order awarding Plaintiffs and the Class reasonable attorneys' fees and costs of suit, including expert witness fees.

## VII. DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all claims so triable.

RESPECTFULLY SUBMITTED AND DATED this 20th day of May, 2026.

WILLIAMS DIRKS DAMERON LLC

By: /s/ Matthew L. Dameron
Matthew L. Dameron, *pro hac vice forthcoming*
Email: matt@williamsdirks.com
Clinton J. Mann, *pro hac vice forthcoming*
Email: cmann@williamsdirks.com
1100 Main Street, Suite 2600
Kansas City, Missouri 64105
Telephone: (816) 945-7110
Facsimile: (816) 945-7118

LEAR WERTS LLP

By: /s/ Todd C. Werts
Bradford B. Lear, *pro hac vice forthcoming*
Email: lear@learwerts.com
Todd C. Werts, *pro hac vice forthcoming*
Email: werts@learwerts.com
Sander C. Sowers, *pro hac vice forthcoming*
Email: sowers@learwerts.com
103 Ripley Street
Columbia, Missouri 65201
Telephone: (573) 875-1991
Facsimile: (573) 279-0024

*Counsel for Plaintiffs and the Proposed Class*